**710**

UNITED STATES, Appellant,

v.

Private First Class Edward E. HICKS,
415–21–8763, United States
Army, Appellee.

ACMR MISC. 8900082.

U.S. Army Court of Military Review.

26 April 1989.

For Appellant: Colonel Norman G. Cooper, JAGC, Lieutenant Colonel Gary F. Roberson, JAGC, Major Kathryn F. Forrester, JAGC, Captain John J. Hogan, JAGC (on brief).

For Appellee: Colonel John T. Edwards, JAGC, Lieutenant Colonel Russell S. Estey, JAGC, Captain Keith W. Sickendick, JAGC (on brief).

Before HOLDAWAY, CARMICHAEL, and GIUNTINI, Appellate Military Judges.

## OPINION OF THE COURT

GIUNTINI, Judge:

The government appeals, pursuant to Article 62, Uniform Code of Military Justice, 10 U.S.C. § 862 [hereinafter UCMJ], and Manual for Courts–Martial, 1984, Rule for Courts–Martial 908(b) [hereinafter M.C.M., 1984, and R.C.M., respectively], a ruling by the military judge suppressing statements made by appellee regarding the wrongful use of another's military identification (ID) card and evidence seized during a search incident to appellee's apprehension for larceny of other personal property, the apprehension occurring after the statements were made about the ID card. This evidence is essential to all charges and specifications which allege various drug offenses, larceny of a radar detector, wrongfully receiving a radar detector, and wrongfully possessing the ID card of another.

On 12 September 1988, a radar detector was stolen from Specialist (SPC) Hensley's truck. Military Police Investigator (MPI) Praizner, on 11 October, discovered that the radar detector had been pawned on 24 September by a soldier using the name of Scott Hart. On 12 October, Private First Class (PFC) Scott Hart was interviewed as a suspect of larceny. In PFC Hart's written, sworn statement, Prosecution Exhibit

Number 5 for identification: (1) he denied any involvement in the theft and pawning of the radar detector; (2) he admitted to possessing two ID cards and to loaning one of them to appellee; (3) he stated that the reason for the loan of the ID card to appellee was because the appellee "wanted to go and buy a six pack of beer at the PX"; and (4) he implied that the appellee still had the second ID card. This statement was not formally offered as evidence for purposes of the trial proper, nor is it clear from the record that it was given to the military judge for consideration on the suppression motion. However, MPI Praizner did testify at the Article 39(a), UCMJ, hearing to the effect that PFC Hart told him the appellee took the ID card to purchase alcohol, that the appellee had the ID card on the date of the pawning (24 September), and that the appellee still had the ID card as of the date of the interview (12 October). However, because evidence was not presented as to any pawn shop transactions, it was left for the military judge to speculate as to exactly how, if at all, the ID card fit into the theft of the radar detector.

Military Police Investigator Praizner also testified that PFC Hart told him that he had seen posters within several companies which stated that the appellee was selling a radar detector. However, it was not clear when PFC Hart had seen the "For Sale" posters. Initially, MPI Praizner testified that PFC Hart told him that the appellee had been trying to sell the radar detector "a week or so prior—or less" to the date of the interview with PFC Hart on 12 October 1988. This led MPI Praizner to believe that the appellee was trying to dispose of the stolen radar detector as recently as one week prior to MPI Praizner's interview with PFC Hart. However, on cross-examination about the "one week," MPI Praizner said, "Approximately, sir; I really don't remember." He also admitted, on cross-examination, that at the Article 32, UCMJ,

investigation he did not mention the "one week" when asked to give the basis for his conclusion that he had probable cause to apprehend the appellee. On this issue, MPI Barrow testified at the Article 39(a), UCMJ, proceedings that he did not hear PFC Hart tell MPI Praizner anything about the sign still being posted as recently as one week before the interview with PFC Hart. Finally, MPI Praizner acknowledged that no mention of "For Sale" posters is found in PFC Hart's statement, Prosecution Exhibit Number 5 for identification. Against this background, it came out at the Article 39(a), UCMJ, session that the appellee told the MPI's that he had, at some time, sold "the" radar detector to "his old roommate," SPC Hensley, the eventual victim of the larceny. Therefore, the military judge reasonably could have concluded that the "For Sale" posters had been placed in the companies prior to an earlier sale of a radar detector by the appellee to SPC Hensley, not after its theft from SPC Hensley.[1] Similarly, although MPI Praizner also testified that the appellee told the MPI's that SPC Hensley had been "his old roommate," MPI Praizner admitted that he had not bothered to check whether the appellee and SPC Hensley were still roommates at the time that SPC Hensley's radar detector was stolen. Therefore, the appellee's access to the radar detector, at the time of its theft, was not firmly established.

▮ Also on 12 October, appellee was questioned by the MPI's after being delivered to them by a noncommissioned officer.[2] Military Police Investigator Praizner testified that when appellee arrived at the station for questioning, he had an ID card and driver's license in his hand, which MPI Praizner noticed that he returned to his coat pocket. When the MPI's asked him for his ID card to use to record information on an interview worksheet, the appellee

---

1. The allied papers contain a statement from SPC Hensley, dated 2 November 1988, which suggests that SPC Hensley purchased a radar detector from the appellee after SPC Hensley's detector was stolen. This information was not available to the military judge. Whether there also had been an earlier sale by the appellee to SPC Hensley is not clear.

2. The military judge ruled the circumstances of the appellee's delivery and initial detention did not amount to an apprehension. We agree.

said he did not have it.[3] Then, when asked if he had his driver's license, he said that he didn't have that with him either. Although MPI Praizner testified that he thought that was suspicious, he admitted that he did not confront the appellee about seeing both the ID card and driver's license in the appellee's hand. On cross-examination, he stated that he did not mention the ID card at the Article 32, UCMJ, investigation because he "didn't think it was relevant at the time."

The appellee was told that he was a suspect in the larceny of a radar detector and a car stereo. He was warned by the MPI's that they wanted to question him about the offense of "larceny of private property." Military Police Investigator Praizner's testimony was uncertain as to whether the appellee was warned by the MPI's that they also wanted to question him about the offense of wrongfully possessing or using the ID card of another. Inherent in the military judge's conclusions of law[4] is his finding of fact that the appellee was not advised by the MPI's that they also wanted to question him about any possible ID card offenses.[5] The appellee denied stealing or pawning a radar detector but made statements about possessing and using PFC Hart's ID card, saying only that he used it for "various reasons." The appellee then was asked if he would mind emptying the contents of his wallet on a desk. He stated that he did not have his wallet with him. Military Police Investigator Praizner testified that he could see the appellee's wallet sticking up out of his left pants pocket. However, he admitted that he did not confront the appellee with this fact. On cross-examination, he testified that no mention was made at the Article 32, UCMJ, investigation about seeing the wallet sticking out of the appellee's pants pocket.

■ When the appellee was confronted with the fact that PFC Hart already had told the MPI's about the second ID card, he asked to speak to a lawyer. At that point, the appellee was told that he was "under apprehension for larceny of private property." A search of his person incident to the apprehension resulted in the seizure of eight small plastic bags of cocaine, PFC Hart's second ID card, and a pawn receipt for the stolen radar detector. When asked about the basis for his probable cause determination, MPI Praizner testified that it was:

> Based on the facts that Hart had rendered a sworn written statement under oath that Hicks was in possession of his ID card and was in possession of his ID card at the time the item was pawned; the fact that Hart stated that there was [sic] posters in the various companies selling [sic] a radar detector; the fact that Hicks had admitted to using Hart's ID card for various reasons and again wouldn't specify why; Hicks admitted that he was Hensley's roommate, therefore having the opportunity of taking the radar detector; and of course the—his performance in the interview.

Eventually, the military judge ruled as follows:

> The court finds the taking of Private Hicks to the station did not violate *Dunaway versus New York*[6] in that the ac-

---

3. On the facts of this case, we do not believe this occurrence amounted to a violation of a lawful order to produce a military ID card which would provide an independent basis to apprehend and search the appellee. *See generally, United States v. Warren,* 13 M.J. 160, 161 (C.M. A.1982) (communication must amount to a positive command). We note this theory was not advanced at the trial level.

4. Detailed essential findings of fact on the record by the military judge would have been helpful. Manual for Courts-Martial, United States, 1984, Mil.R.Evid. 304(d)(4).

5. Obviously, the military judge also did not think that the warning about being suspected of "larceny of private property" included, as a matter of law, a warning as to possible ID card offenses. Insufficient information was presented to the military judge to show how the ID card was connected to the alleged larceny of private property. Given the posture of the evidence, we agree with the military judge's conclusion of law.

6. 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979).

cused was not under apprehension at that time. Secondly, that any statements made by Private Hicks regarding the use of Hart's ID card are the result of a violation of Article 31 by the MPI and cannot be used to support probable cause. And lastly, that there is insufficient probable cause to justify the apprehension of the accused for the larceny. Therefore, the defense motion to suppress is granted.

This court's review of the military judge's ruling is limited to a review of matters of law. Article 62(b), UCMJ. Thus, the question before us is not whether we might disagree with the trial judge's findings, but rather whether those findings are fairly supported by the record. *United States v. Burris*, 21 M.J. 140, 144 (C.M.A. 1985) (citations omitted).

In this case, the government relied on the testimony of MPI's Praizner and Barrow to establish the probable cause to apprehend and then search the appellee. Some factors in the probable cause equation about which the MPI's testified involved pure credibility assessments by the military judge. For example, on the issue of whether the appellee was advised that he was suspected of committing an ID card offense, MPI Barrow testified, "not to swear but I believe that he was verbally advised, showing him the Judge's Bench Book of the various offenses." Obviously, the military judge determined that the appellee had not been so advised. Other factors were subject to discount by the military judge because their relevancy was not fully developed on the record. For example, the appellee told the MPI's that

the victim of the larceny was "his old roommate" but it was not clarified when that relationship was terminated. Thus, the appellee's access to the stolen item was not established. Similarly, although the appellee's "For Sale" signs had been seen in the battalion, it was not exactly determined when they had been seen.[7] Therefore, it was possible that the posting of the signs had been in connection with the appellee's earlier sale of the radar detector rather than an attempt by him to dispose of stolen property.

 The military judge concluded that the warnings given to the appellee were incomplete and that the facts made available to the apprehending individuals did not amount to probable cause to apprehend the appellee for the theft of a radar detector. Given the evidence of record, we are not prepared to say that the military judge was wrong as a matter of law.[8] *United States v. Middleton*, 10 M.J. 123, 133 (C.M.A.1981) (military judge's conclusions reached below should not be disturbed unless they are unsupported by the evidence of record or were clearly erroneous). Accordingly, the appeal by the United States, under Article 62, UCMJ, of the military judge's ruling is denied.

Chief Judge HOLDAWAY and Judge CARMICHAEL concur.

7. The allied papers show that at the first Article 32, UCMJ, investigation SPC Hensley, the victim, testified that he believed a "For Sale" sign was written on a chalk board before his radar detector was stolen.

8. We also do not think, on the record before us, that the appellee's apprehension, and search, can be justified on the basis of probable cause to believe that he had committed an ID card offense. This theory was not developed factually at trial, was not the reason advanced by the MPI's for the appellee's apprehension and was not argued by the trial counsel. Also, this theory might violate the proscription against using a minor offense as a sham or cover for a search for evidence of an unrelated crime for which no probable cause to apprehend exists. *See United States v. Santo*, 43 CMR 134, 136 (C.M.A.1971) (citations omitted) and *United States v. Guzman*, 864 F.2d 1512 (10th Cir.1988).